v. United States of America Oral Argument, 915.15 minutes per side, Patricia Muskell  May it please the Court, I am Pat Muskell representing the appellants A.O. Smith Corporation and the Gaylord Companies and with the permission of co-counsel and the Court, I will also present argument today on behalf of the appellants in the consolidated case. I would like to reserve three minutes for rebuttal. In May 2010, the Army Corps of Engineers was negligent in their management and operation of Old Hickory Dam, a federal dam project that has no flood control purpose or capacity. Instead, Old Hickory Dam is a flood-causing project. It was designed, built, and is operated for purposes other than flood control. It's operated for hydropower generation and navigation. It's always interesting when people start out and they at least arguably make little extreme statements. So when you say that this dam has absolutely no flood control, and I think you used the word capacity, of course you're saying they were negligent because they didn't do certain things that would have ameliorated the effect of the flood. So by definition, whether it was designed for this or not, it has a certain flood control capacity or else there's nothing they could have done that you would be complaining about that they failed to do. Would that be a fair statement? We would characterize it this way, Your Honor, that this project only has surcharge storage. The Corps manuals state... But you're only complaining about their activities involving the surcharge storage. We are complaining about their activities. There has to be some capacity then. There may be some flood control ancillary benefits, but there is no flood control purpose. As stated in the Corps manuals, they repeatedly state throughout all of their documents in testimony before Congress that this facility has no flood control purpose or capacity. The distinction is an important one, Your Honor, because flood control facilities projects have massive flood control storage pools. Old Hickory does not. It has a very, very small surcharge storage pool. The only purpose of which... In what case are you relying upon to now inject this new, I think, argument about the size of the capacity? I don't see anything in any of your pleadings or the cases that deal with trying to quantify how much flood control there is or there isn't. I'm not stating that as a legal proposition, Your Honor. I'm stating that as a fact that exists in this case. It is the difference and the distinction between flood control projects on the one hand and other federal projects for hydropower and navigation that have no flood control capacity as determined by the Corps. That project was not designed by the Corps to have any flood control capacity. Because of the lack of that flood control purpose, it was not authorized or funded by the Corps to control floods. The only purpose it serves is to mitigate the risk that the Corps itself has created by the construction of the dam. All of this makes no difference unless you can get around the language in central green that says that we look to flood or floodwaters. So you've just conceded, I'll bet reluctantly, that in connection with the top part of the storage capacity of this dam, there is water in there that can, not in a great way, but to a certain extent be used in connection with controlling floods. Because the failure to do that is what you're complaining about. We are complaining about the failure to preserve the small surcharge storage that it has, which is to mitigate the Corps enhancing downstream flooding, which is really our argument here. Failure to do that meant there was too much water in there, and that water had to be released too fast, and that's what affected the flood, right? So there's no realistic dispute about that water that you're arguing about. Was flood or floodwaters? We do not dispute that it was flood or floodwaters, Your Honor. Well then, you're squarely barred by green unless green didn't intend to overturn the claims that speaks about whether it was in connection with a flood control project. Isn't that what you're saying? That is exactly our position, Your Honor, that Central Green did not overrule James. And as the Corps in... That is your position because Central Green, I assume you are saying, assumed the status as a flood control project, so didn't actually have to address that. It was only addressing the waters. It was only addressing the water issue. As the Court itself said in Central Green, the narrow question presented in Central Green was whether the words of the immunity statute encompass all water, all of the waters that flow through a federal facility that was designed and is operated at least in part for flood control purposes. That was the factual underpinning of that case, is that a federal flood control project was involved. What I don't understand about your argument is they say right in green, referring to how some courts had, in their mind, incorrectly been citing dicta in James, they said that some courts to focus on whether the damage relates in some often tenuous way to a flood control project rather than whether it relates to flood or flood waters. I mean, doesn't that expressly refute the argument that you make that they were still trying to focus in some way on the connection to a flood control project? Well, in Central Green, the Court expressed, restated what its holding in James was. And it said, we held in James that flood control immunity bars recovery where the federal government would otherwise be liable under the Federal Tort Claims Act for personal injury caused by the federal government's negligent failure to warn of dangers from the release of flood waters from federal flood control projects. That's exactly what Green said, or what James said, because it was a federal control project. So I'm sure that's what they held. And the Court reaffirmed that in Central Green in two different places, the Court reached back and said, we rule today on the scope of immunity illuminated by our holding in James and informed by our holding in James. The Court only disavowed a small portion of the dicta in James. It did not overrule the threshold requirement that a flood control project be involved. Let me ask you this question. So in terms of cases, since those cases in the circuits, NRA Katrina breaches litigation, the Fifth Circuit case, how would you, was that rightly or wrongly decided in your view? With respect to the portion of the Katrina decision that deals with the flood control project requirement, we would submit respectfully that that portion was wrongly decided. That has been the only circuit court to consider this issue post-Central Green. So there are three possibilities in regard to the test, I think, that one is a flood control project, and that's what you maintain, right? Then there's another one, flood control activity, right? That's correct. And then the other just has to do with whether it involves floodwaters. Floods or floodwaters, correct, Your Honor. And you maintain that the flood control project is still required. Absolutely. That is an underpinning of the decision in James. It was not overruled in Central Green. It is consistent with the law in this circuit under Cantrell that a flood damage be connected to a flood control project, and Cantrell further requires that there be some flood control activity as well. We contend here we do not have a flood control project. Admittedly, Your Honor, their damage was caused by floods or floodwaters. We also contend that the activity engaged in by the Corps was not flood control activity. As the law states, it is quite different than flood control story. So if we were to apply the flood control activity test, you would say this doesn't involve flood control activity? It did not involve flood control activity. In fact, many of the negligent acts of which we complain occurred before the rains even began to fall and before there were any floodwaters. Why is something that you're supposed to do but failed to do it before the flood to ameliorate the flood, not a flood control activity? Because it was activity to preserve storage capacity, surcharge storage capacity, so that the Corps would not enhance the risk of downstream flooding. That is the risk created by the dam. That is the duty that the Corps has undertaken by constructing that dam is to ameliorate, to mitigate that downstream risk. Clearly, in this case, Your Honors, the Cumberland River was going to flood. Our position is that but for the Corps' negligent action, that flooding would have remained below the 100-year flood plain. Because of the Corps' negligence, it rose well above the 100-year flood plain and caused the damages. Well, the statute, if you go back to the statute itself, even before you get to interpretations, it says, no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or floodwaters at any place. That's pretty broad in terms of the statute itself. That's very broad in terms of the statute. However, the scope of the immunity has been defined, the contours of that have been defined and narrowed, first by James and then by Central Green. The statute itself must be placed in context of its purpose because the government doesn't otherwise have any liability for flooding. The only reason that that statute came into existence is because the government undertook flood control projects through the Flood Control Act of 1928. You have to put the statute, the immunity statute, in the context of the overall purpose of the Flood Control Act, which was to fund... Just one last question. I don't want to interrupt. Yes, sir. But you're saying that if there was flooding and the government sought to do something about the flooding, it was not a project that existed for that purpose, but it decided to take action. If it did that, that it would be subject to liability. It would not be immune because it would not be a project. It would not have been a project funded and authorized by Congress for flood control purposes. That is our position. We also maintain, Your Honors, that this is outside of the discretionary function exception, and I see that my time is up. Thank you, Counsel. May it please the Court, Alisa Klein for the United States. The flood control immunity would apply here regardless of how the case is analyzed, any of the three possibilities, and I'll try to walk briefly through each one. Of course, you would start with the plain language of the statute, which the Supreme Court emphasized does not have the word flood control project in it. Instead, what the Supreme Court said is it talks of damage by or from floods or floodwaters. You don't even need a canon of interpretation here because the language is unambiguous. If you were to look to the canons of sovereign immunity, the Supreme Court has repeatedly held, including in James, that any ambiguity has to be interpreted in favor of the government. What was the point of the statute? If there's absolutely no liability for the government whatsoever from anything that could be characterized as a floodwater, why bother with the statute? This is the other side's argument, which is, isn't this strange? The answer is no. If you look back at the Flood Control Act of 1928, Congress in the same legislation was authorizing related public works, improvements for navigation, hydroelectric power, flood control, and said at the same time, but we're not spending money on damage from flooding. Essentially, if there's damage caused by floods and floodwaters, no dispute here when you have unprecedented rainfall and the water is released at flood stage, that that's what you have, that the government is immune. Essentially, businesses, insurance companies will pay rather than the taxpayer. So it's not at all strange, and the Supreme Court in Central Green specifically admonished that to determine whether this immunity applies, you do not look for a connection to a flood control project, you look... But where in Central Green did the Supreme Court say you do not look to whether it's a flood control project? On page 437, and this is a quote, in determining whether Section 702C immunity attaches, court should consider the character of the waters that cause the relevant damage, rather than the relation between that damage and a flood control project. That's a relation between the damage and the flood control project, and I concede that that language is there, but that's not the only language in Central Green which deals with the underlying problem, which seems to me that we have, which is that James was a flood control project. Well, again, I don't want to just go in circles. The language is clear, and Congress understood when it passed this language that it was authorizing various related projects, improvements in rivers and channels, and it said no liability for flooding. So, and the Supreme Court, which is also Central Green, said it's relatively easy to determine that a particular release of water that has reached flood stage is flood water, and that is what we have here. It's not contested, but I will move on. I want to make clear that this... Before you move on, I mean, you really can't, there really isn't any answer to that question. Is there other than to say this apparently was a belt and suspenders approach, and whether that's strange or not, lots of things that are strange. I misunderstood the question. No, I agree that Congress was confirming that there will be no liability for damage from floods or flood waters. This question that she asked you is, if they already have immunity, why did they use this particular language if it's as broad as you say it is? I'm still not understanding. I mean, this is the reservation of immunity. Start with immunity. They already have immunity. It's the government. Yes. They then build these projects. Why did they put language in that says they have immunity if they already have immunity? What were they trying to accomplish other than belt and suspenders? I think that's accurate, to make absolutely clear that there shall be no liability for damage from floods or flood waters. Before I move on, I just also want to make clear why we care, because even though in this case it doesn't matter, the Katrina litigation illustrates the problem of starting to ask what's the connection to flood control activity, flood control projects. We ultimately won on discretionary function immunity grounds in the Fifth Circuit, so there was no liability there. But this was after trials that cost millions of taxpayer dollars. The point of immunity provisions is that you're immune up front. It doesn't require trials and the expenditure of public resources in order to determine whether the immunity applies if you have a hurricane or a one-in-a-thousand-year storm as we had here. So I am going to move on, but I just want to make sure I'm pausing to say I'm not moving on because of any concession. I'm moving on because in this case the district court correctly concluded that it doesn't matter. So here, the plaintiffs want to focus on old hickory and isolation. Even if you did that, the activity, we're just talking about the flood regulation provisions of the old hickory manual, and the whole argument is you should have discharged more water in advance of the storm in order to have even more capacity to store flood waters during the storm. But again, in the real world, as the manual explains, the court doesn't operate old hickory in isolation. It's in conjunction with all of the conceded flood control projects. So if you picture, you've got old hickory is upstream of Nashville. Here's what I'm not understanding at this point. If the government's position is there's absolute immunity from anything having to do with something that could be called a flood water, regardless of whether the government has come in and messed around in the area and created the benefit, which resulted in the flood, if your view is that there's simply no immunity, period, why do we care about the Federal Tort Claims Act? Well, this was a question that came up in James, and it was did the Federal Tort Claims Act change anything about the flood control immunity, and the Supreme Court said no. So we don't need to get to the discretionary function exception because this immunity applies, and that's always been our position. But you would need a cause of action in the first place, and that would be supplied by the Federal Tort Claims Act, but for this immunity provision. So, and just to pick up what I was saying about flood control, so you have upstream of Nashville, you don't just have old hickory, you have the Jay Percy Priest Flood Control Project, and this is a conceded flood control project. And what the Corps is looking at is you want to limit the combined flow in Nashville based on just storm water runoff, releases from old hickory, and releases from Jay Percy Priest. And so it's all operated as a system. If you want to preserve capacity at Jay Percy Priest, you have to release less at old hickory. You can't, it's like, this is why all the manual provisions say operating old hickory in conjunction with Jay Percy Priest. And then the water doesn't stop at Nashville, it flows on and ends up at the Barkley Flood Control Project, which has capacity in order to protect the Mississippi River levee system. And so the Corps, this is why the manuals repeatedly say it's a system, and real-time reservoir management requires a great deal of judgment and operation. It's because it's looking at all of the pieces together. And it really, in the real world, you can't just look at old hickory or Cordell Hall or Cheatham or any one of these dams as if that's the sole focus of the decision making when you're talking about flood conditions. And I'm gathering then that it's that interrelationship and the policy that flows from that that you believe satisfies the second part of the discretionary function test under the Federal Torque Claims Act. Correct. You know, in normal conditions, there are various countervailing concerns like you maintain the level that's optimal for power production and navigation. In flood conditions, where obviously the priority is to stop flooding, you have to think about what happens if I release water from one place, where does it go, what are the consequences downstream for both the people who live there, the cities, but also the other flood control projects. And if you try here, in some discretionary function cases, you can say, well, if I look at a level of specificity, it's hard to see policy, as in the coal case. Here, there's no, if you say what should the Corps have done, well, if they say on the Thursday before the storm was Saturday, Sunday, on the Thursday, if they say you should have released more water from Old Hickory, well, then the answer is, well, at that point, the forecast was for six and a half inches of rain. There was no reason to. And if you say, well, you know, on the Saturday, you know, after you already had significantly more rain than was expected, then you have to say, well, where's this water going to go and what's it going to do to the capacity at J. Percy Priest and what's it going to do at Barclay and what's it going to do to, you know, the downstream stream banks. And so there are, this is why the district court was saying, given the dynamics, the changing dynamics of a storm, the way the Corps works in the real world is it's constantly exercising judgment grounded in policy. But you do that when you go home and just leave the place sort of to its own devices. I'm sorry? Hard to exercise that discretion when you go home and leave the place to its own devices. Nobody knows, as far as I can tell from this record, whether there were any mandatory, any requirements about keeping the place manned during a flood. Okay, let me explain that particular allegation. And all of these allegations, as far as we can tell, are drawn from the Corps' own after action report, which the plaintiffs cite on page 45 of their brief and, you know, with the link. And we would be happy for the court to look at that. So this particular allegation has nothing to do with Old Hickory anymore. Now this is just the Nashville district that the water manager worked two Saturday shifts, a morning shift and an evening shift. And this was in accordance, it says, in accordance with established procedure. And it wasn't that then, you know, Old Hickory or anywhere else was unmanned. It was just different people. And courts have repeatedly, including this court, said that decisions about how you allocate your staff, when they work, Saturday shifts, things like that, are protected by this discretionary function exception. And of course, for purposes of the Flood Control Immunity, this would not matter at all. You're just looking at the waters that caused the damage. And I believe the court said they didn't know whether there... If you're correct on the Flood Control Act Immunity, then it wouldn't matter whether there was anybody manning Old Hickory at all. That is correct. It is not, the Flood Control Act Immunity doesn't depend on theories of liability. As James said, it doesn't matter if you characterize it as a failure to warn. It's just, you're looking and saying, the way lots of insurance companies say, we are not going to insure flood damage. The United States Congress has said, we are not paying, the taxpayer is not paying for flood damage. So the government says, we're building this dam, we're from the government, we're here to help you. And no matter what happens as a result, that's on you, not on the government. To be clear, we're improving the Mississippi, Ohio, Cumberland rivers for navigation, hydroelectric power, recreation, and flood control. It costs a ton of taxpayer money. And what they're saying is, when you have unprecedented rains falling from the sky, the taxpayer is not going to pay for that also. That was the judgment of Congress as reflected in the Flood Control Act. Your position would be that no matter whether it's unprecedented rains falling from the sky, the taxpayer is not going to bear the burden for any damage. I don't believe that's what we're saying. I mean, this court's landmark decision back in 1978, I think, correctly focused on the fact that there were unusually heavy rains causing the water to be at flood stage. I'm not talking about what this court may have said. I'm talking about your position that the immunity is absolute if the water can be characterized as flood water. Well, by floods and flood waters, we're talking about if there's a hurricane that forces a storm surge into the city of New Orleans, if there is 13 inches of rain on Nashville doubling the recorded record in all of history. So that's floods and flood waters. And yes, that is what Congress said is the basis for the immunity attaching. And again, I don't think it's that surprising, but particularly if you look at the original statute where Congress said, we are authorizing expenditures for all sorts of improvements on the Mississippi River and its tributaries, but we will not accept liability for flood damage, any damage by or from flood waters at any place. Let me ask two quick questions. One, I think it's clear in terms of your argument. So whether we apply a flood control activity test or a broader test regarding the flood waters, you feel you prevail on either of those? Correct. And any of the tests described, yes. Okay. Also under the flood control project test, you feel you prevail under that? Yes, because again, you can't just look at Old Hickory. You have to look at it in conjunction with Jay Percy Priest, which is the flood control project that's upstream of Nashville. So you could just as easily have said you should have had more capacity at Jay Percy Priest as saying you shouldn't have released water from Old Hickory. And also just to kind of fill it out, the reason that there was this flooding, as explained in Major General Peabody's congressional testimony, was that it's not just that there was far more rain than you'd ever seen before, 13 inches. It was where it fell, which was downstream of the other three major flood control projects. So their capacity couldn't be used to the fullest. All right. And the other question. So it's pretty clear that you think you should prevail under the flood control, under the statute involved here. But if you didn't, then we're looking at discretionary function. I know you say we shouldn't go there. I just had a question for you. So below, the trial court didn't allow jurisdictional discovery, which the plaintiffs maintain would have given them more information regarding the EAP and internal directives, so that they could be in a better position to argue that the actions were non-discretionary. What's your view on that? Okay. Three quick related points. One, of course, they have all the manuals, the after action report, the testimony. So this is like the cases in which courts of appeals have denied discovery, like Freeman and the Dictor Mad cases. It's not like the D.C. Circuit's Ignatieff decision, where because of the nature, it was secret service policies. They were not public. They had nothing. Second, I couldn't find the place where they asked the district court for discovery. And perhaps they'll correct me. Maybe it was in there and I just missed it. So if the court is wondering why, the district court didn't specifically address this. And third, even in the Ignatieff scenario, the D.C. Circuit made clear that you're talking about discovery into manuals, established government policy, I think is the term the Supreme Court used in Gobert. Not when they say directives, they're talking about communications, you know, between various core personnel, like minute by minute during the storm. That cannot establish a mandatory directive. You need to be looking at something like the manuals, which they have and which are in the record. Thank you. Thank you, counsel. First, I would like to address the argument that this is, Old Hickory is part of a system and it depends upon the interaction with Percy Priest. It is a fact that no releases were being made from Percy Priest during this entire event. What we have is Old Hickory Dam as a stand-alone unit being operated as a stand-alone unit, and it was the releases from only that dam project that caused the Cumberland River, the surge, to rise above the 100-year flood plain, so that the government is incorrect. Why does it mean that it's not a system if at the time of this particular storm it wasn't being operated in conjunction with the other dams? I mean, if she's right that all the rainfall came downriver of the other system, then of course they would not be operating cooperatively, factually at that time, because it just wouldn't work. I don't get your argument. Why it's important, Your Honor, is that all of the available releases that could have been made could have been made solely from Old Hickory Dam, and this is a facial challenge to subject matter jurisdiction here. Are you saying that in this case there's no immunity because it wasn't being operated in conjunction with the other dams? In another case where, say, the rainfall had been spread throughout the valley more broadly and it was being operated in conjunction with the other ones, then it would be part of a system and there would be immunity? So it's sort of storm by storm? I think it is very fact, a very fact-specific inquiry, and I think that you have to look at the particular facts here as alleged in the complaint, which must be taken as true because we are on a facial challenge. And that factual record hasn't been developed. However, it is the plaintiff's position that expert proof will demonstrate that their releases could have been made to minimize, to keep the flooding below the 100-year flood plain. That allegation needs to be taken as true for purposes of this Court's decision on subject matter jurisdiction. I'd also like to address quickly the additional source of directives that the plaintiffs have not had the benefit of. An emergency action plan is required by core federal regulations. Each project must have that emergency action plan, which is to contain directives that must be followed in the event of emergency conditions, such as this flooding that was reported. We did not have the benefit of that. We requested it. Through a FOIA request it was denied. We also maintain that the water manager's directives... Just a moment. Just to clarify the record, you didn't move the district court for a discovery in regard to that? That's correct, because this was a facial challenge to subject matter jurisdiction and jurisdictional discovery has not yet been had. But counsel for the government says that she doesn't find any place where you actually asked for this discovery. We asked for the discovery through the Federal Information Act, and it was denied. But you didn't ask for it in the context of the lawsuit? Not in response to the facial challenge for subject matter jurisdiction. If it had been a factual challenge, I see my time is up, if I may finish. Yes, please do. If it had been a factual challenge, then that discovery would have been sought. But you didn't really need it, is what you're saying. We maintain, Your Honor, that there are specific enough directives in the Corps manual, including the limiting of the fill rate of the reservoir pool that was violated that is sufficient to withstand the facial challenge to the subject matter jurisdiction motion made by the government. But for the Corps' negligence, this would have been an endurable event below the 100-year flood plain. Thank you. Thank you, counsel. The case will be submitted.